**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

YOLANDA ROBINSON,                       :        1:13-cv-0602
                                        :
            Plaintiff,                   :        Hon. John E. Jones III
                                        :
    v.                                   :
                                        :
LIBERTY LIFE ASSURANCE                   :
COMPANY OF BOSTON,                       :
                                        :
            Defendant.                   :

## MEMORANDUM

### June 11, 2014

Before the Court are the parties' cross-motions for summary judgment in this matter respecting the Employment and Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461.  For the reasons that follow, the Court will deny Plaintiff's motion and grant Defendant's motion.

## I.    BACKGROUND

We begin by enumerating the undisputed facts, which are supported by record evidence, noting as we do that the parties fundamentally disagree on some significant factual points.

Plaintiff worked for Comcast from 2004 to 2010 and was a resident of California.  (Doc. 1, ¶ 11).  As a full-time employee, she became insured under a

group Long-Term Disability Policy (the "LTD Policy" or the "Policy"), effective

June 1, 2005.  (Doc. 1, ¶ 12).  Defendant provides long-term disability insurance to

employees of Comcast pursuant to the Policy.  (Doc. 29, ¶ 1).

## A.    The Policy

Relevantly, the LTD Policy categorizes employees as either Class 3 or Class

4, which among other things, affects eligibility for benefits.  (*See* Doc. 1-1; Doc.

30-1).  The Policy provides a general definition of "disability," which pertinently

states as follows:

> 1.  For persons other than pilots, co-pilots, and
> crewmembers of an aircraft:
>
> * * *
>
> b.    i.  if the Covered Person is eligible for the 12
> Month own Occupation benefit, "Disability" or
> "Disabled" means that during the Elimination
> Period and the next 12 months of Disability the
> Covered Person, as a result of Injury or Sickness,
> is unable to perform the Material and Substantial
> Duties of his Own Occupation; and
>
> ii.  thereafter, the Covered Person is unable to
> perform, with reasonable continuity, the Material
> and Substantial Duties of Any Occupation.

(Doc. 1-1, p. 9; Doc. 30-1, p. 10).  For purposes of the 12-month "own occupation

benefit," "own occupation" refers to the occupation a covered person was

performing when his disability began.  (Doc. 1-1, p. 12; Doc. 30-1, p. 13).  "If the

Covered Person is unable to earn 80% of his pre-disability earnings, he will be considered unable to perform his Own Occupation.  For purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy."  (Doc. 1-1, p. 12; Doc. 30-1, p. 13).

Following the 12-month period, a covered person must be unable to perform "any occupation" to be considered disabled, and the Policy provides different definitions of "any occupation" depending on the class of employee.  With respect to Class 3 employees, "any occupation" "means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.  If the covered person is unable to earn more than 60% of his pre-disability earnings, he will be considered unable to perform Any Occupation."  (Doc. 1-1, p. 7; Doc. 30-1, p. 8).  As to Class 4 employees, "any occupation" is defined as "any gainful occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.  Gainful occupation means any occupation in which the earnings are: equal to or greater than 80% of the Employee's pre-disability income; less than 80% of the Employee's average pre-disability income, but higher than the average earnings for the geographic area in which the Employee resides; or equal

to or greater than the gross benefit." (Doc. 1-1, p. 7; Doc. 30-1, p. 8).

Additionally, the Policy states that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefits eligibility hereunder. Liberty's decision regarding construction of the terms of this policy and benefits eligibility shall be conclusive and binding." (Doc. 26-2, p. 46; Doc. 30-1, p. 46).[1]

## B.    Plaintiff's disability claims

On October 13, 2010, in anticipation of knee-replacement surgery, Plaintiff notified Defendant that she would be claiming short-term disability benefits. (Doc. 29, ¶ 3). The parties agree that Plaintiff had a disability onset date of October 17, 2010. (Doc. 26, ¶ 1). Plaintiff underwent surgery on her right knee on November 8, 2010, and attended physical therapy from November 15, 2010, until January 14, 2011. (Doc. 1, ¶ 15). Ultimately, Defendant approved Plaintiff's claim for short-term disability benefits, and she received benefits under the plan through April 15, 2011, the maximum duration for short-term benefits. (Doc. 29, ¶ 5).

Shortly before the expiration of her short-term benefits, Defendant began

---

[1] Plaintiff, at one point, argues that this provision granting Defendant discretionary authority in interpreting the Policy "may not appear anywhere in the policy," noting that Defendant provided an incorrect citation for the language. (Doc. 34, p. 4). However, Plaintiff's challenge is not supported by record evidence, as, significantly, Plaintiff herself submitted copies of the Policy containing the subject language. (Doc. 1-1, p. 42; Doc. 26-2, p. 46).

evaluating whether Plaintiff was eligible for benefits under the LTD Policy, which involved an evaluation of whether Plaintiff could return to her "own occupation" within the meaning of the Policy (Doc. 29, ¶ 6).  The most recent relevant medical information in Plaintiff's file was a letter dated January 27, 2011, from Plaintiff's orthopedic surgeon, Dr. William Richard Cimino, M.D.  (Doc. 29, ¶ 8).  The note declared Plaintiff "permanently disabled from cable sales and installation related to the right knee surgery," which "precluded [her] from climbing, squatting, and kneeling."  (Doc. 29, ¶ 8).  Defendant utilized these restrictions in determining whether Plaintiff could perform her "own occupation" and referred Plaintiff's case to its Vocational Rehabilitation Department for an occupational analysis.  (Doc. 29, ¶¶ 9-10).[2]  Vocational Case Manager Alice Bartha prepared a report (Doc. 30-7, pp. 9-13), opining that Plaintiff's occupation was best represented by the general sales representative occupation described by various Department of Labor publications, and concluding that such occupation was typically performed in the national economy at both the sedentary and light physical demand levels, with sufficient opportunities existing in both subsets.  (Doc. 29, ¶ 11).  Although Defendant determined that Plaintiff was physically able to return to her own

---

[2]  Defendant lists Plaintiff's occupation as Field Sales Representative (Doc. 29, ¶ 10), while Plaintiff maintains that she was employed as a Direct Sales Representative (Doc. 33, ¶ 10). This distinction does not appear material for our purposes.

occupation, as performed in the national economy, Defendant nonetheless approved her long-term disability claim because it found that the earnings of the relevant occupation fell short of 80% of Plaintiff's pre-disability earnings, as required by the definition of "own occupation" in the LTD Policy.  (Doc. 29, ¶ 12). Accordingly, Plaintiff began receiving long-term disability benefits under the Policy effective April 16, 2011.  (Doc. 29, ¶ 14).  Pursuant to the applicable definition of "disability," Plaintiff was entitled to receive 12 months of this "own occupation benefit"; after the 12 month period, Plaintiff would be eligible for long-term benefits only if she was "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."  (Doc. 1-1, p. 9; Doc. 30-1, p. 10).[3]

On November 2, 2011, in anticipation of the application of the "any occupation" provision (due to occur on April 16, 2012), Defendant requested updated medical records from Plaintiff's treating physicians.  (Doc. 29, ¶ 15). Thereafter, Plaintiff notified Defendant that the January 27, 2011, letter from Dr. Cimino constituted the most recent medical record.  (Doc. 29, ¶ 16).  Defendant

---

[3]  As an ancillary matter, the Social Security Administration determined that Plaintiff was entitled to monthly disability benefits beginning April 2011.  (Doc. 26, ¶ 9; Doc. 26-3, pp. 2-5). By way of reason for Plaintiff's eligibility, the SSA merely stated that "entitlement began." (Doc. 26-3, p. 2).  Her monthly benefit amount was $1,112.00, and, after certain deductions, her actual payment amount was $996.00.  (Doc. 26-3, p. 2).

then requested the preparation of a Transferable Skills Analysis and Labor Market

Information Report to aid in its benefits determination.  (Doc. 29, ¶ 17).  The report

was prepared by Cascade Disability Management, Inc., a vocational consultant,

and dated December 1, 2011.  (Doc. 30-6, p. 27).  It identified three occupations

that Plaintiff could perform based on her training, education, work experience, and

physical capabilities: sales representative (own occupation), customer service

representative, and dispatcher.  (Doc. 29, ¶ 19; Doc. 30-6, p. 28).  The report also

contained a monthly wage table, showing wages at the 25th and 50th percentile for

each job across the relevant metropolitan (Sacramento-Arden-Roseville, CA), state

(California), and regional (Census Pacific, West Region) areas.  (Doc. 30-6, p.

28).[4]  The table is reproduced here:

---

[4]  At the time she filed for LTD benefits, Plaintiff resided in Ione, California (Doc. 30-7, p. 17), approximately 40 miles from Sacramento.  She moved to Oregon in February 2012. (Doc. 30-2, p. 7).

| Occupation | Monthly Wage | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | MSA[1,4] | | State[2,4] | | Region[3,5] | |
| Sales Representative - (utilities cable, electric, phone) (own occupation) | $3238 - $4758 | | $3279 - $4752 | | $3233 - $4299 | |
| Customer Service Representative (e.g. utilities, cable, electric, phone, etc.) | $2314 - $2857 | | $2352 - $2957 | | $2253 - $2785 | |
| Dispatcher | $2553 - $3312 | | $2382 - $3092 | | $2427 - $3486 | |
| | MSA[1,6] | | State[2,6] | | Region[3,6] | |
| All Occupations within Geography | $4228 | | $4174 | | $4179 | |

[1]   Sacramento-Arden-Arcade-Roseville, CA Metropolitan Statistical Area
[2]   California
[3]   Census Pacific; West Region
[4]   Percentile Wages, May 2010
[5]   Percentile Wages, June 2010
[6]   Mean Wages for All Occupations within Geography

(Doc. 30-6, p. 28).

By letter dated January 9, 2012, Plaintiff's treating psychiatrist, Dr. Lisa Wang, M.D., informed Defendant that Plaintiff "is currently disabled and cannot go back to work on April 2012 due to her illness." (Doc. 29, ¶ 20; Doc. 30-4, p. 22). Upon receipt of the letter, Defendant requested the production of Dr. Wang's treatment records from October 2010 to the present, and Dr. Wang's medical group responded that "no medical records [were] found at this facility. (Doc. 29,¶ ¶ 20, 21).

On April 4, 2012, Defendant notified Plaintiff that she was ineligible for long-term disability benefits beyond April 15, 2012. (Doc. 29, ¶ ¶ 22-23). The

letter set forth the relevant definitions provided by the LTD Policy, including the definition of "any occupation" applicable to Class 3 employees (*i.e.*, 60% pre-disability-income threshold). (Doc. 30-4, p. 10). The denial letter noted that Defendant had requested medical records from Plaintiff's various providers, that no records were received from Dr. Wang, and that the letter of January 27, 2011, was the most recent document obtained from Dr. Cimino. (Doc. 30-4, p. 11). Defendant then recounted that a vocational analysis had been conducted with consideration to Dr. Cimino's restrictions and limitations, listed the three occupations identified by the vocational consultant, and provided a reproduction of the wage table shown *supra*. (Doc. 30-4, p. 11). Based on the medical and vocational reviews, Defendant concluded that, as of April 16, 2012, Plaintiff would no longer meet the definition of "disabled" and notified her that her benefits would be terminated on April 15, 2012. (Doc. 30-4, p. 12). In addition, the letter advised Plaintiff of her right to request a review of the benefits determination and the procedure for forwarding such request. (Doc. 30-4, p. 12).

On April 17, 2012, Defendant received correspondence from Plaintiff requesting review of the disability determination. (Doc. 29, ¶ 26). The letter stated as follows: "I have two doctor letters that explain [I] am permanently disabled. That is the reason for my appeal." (Doc. 30-3, p. 16). Around that time,

Defendant also received a letter from Dr. Wang advising that Plaintiff has bipolar disorder, as well as mood swings, memory problems, and difficulty concentrating, and opining that Plaintiff is permanently disabled.  (Doc. 30-3, p. 17).  In addition, Dr. Wang's office sent therapy notes from January 9, 2012, to April 6, 2012.  (Doc. 29, ¶ 26).  Defendant spoke with Plaintiff on May 1, 2012, confirming that there were no additional medical records for purposes of the reconsideration.  (Doc. 29, ¶ 27).

Thereafter, Plaintiff's file took the following trajectory through Defendant's review process.  Defendant first referred Plaintiff's case to a nurse case manager, Tammy Scarponi, for review, who concluded that Plaintiff's physical restrictions were limited to those identified in Dr. Cimino's letter of January 27, 2011, and stated that she was unable to determine the severity of Plaintiff's psychiatric impairment due to inconsistent information in the treatment records.  (Doc. 29, ¶¶ 28-29).  Next, the case file traveled to Defendant's appeals review unit for disposition.  (Doc. 29, ¶ 30).  However, a request was made for an additional file review, and the case was referred to another nurse case manager, Thomas Sutton.  (Doc. 29, ¶ 31).  Mr. Sutton ultimately recommended that Plaintiff's file be forwarded to a psychiatrist for peer review, and Defendant enlisted Dr. Gregory Barclay, an independent board-certified psychiatrist, to examine the file.  (Doc. 29,

¶ ¶ 31-32).

Dr. Barclay submitted a report on June 4, 2012, determining that the medical evidence supports a diagnosis of Depressive Disorder NOS but does not demonstrate a diagnosis of Bipolar II Disorder or Major Depressive Disorder. (Doc. 30-3, p. 2).  He additionally opined that

> [t]he medical records are insufficient to support cognitive/social/occupational impairment up to 4/16/12 due to the diagnosis of Depressive Disorder, NOS supported in the records.  This is because the record lacks sufficient objective evidence of cognitive impairment in the form of mental status examination findings or other objective findings such as provider-completed rating scales and cognitive testing.  The available records rely heavily on claimant self report and there is no measure included to determine whether the claimant's self-report is subject to exaggeration or distortion for primary or secondary gain.  This is important to know, since the claimant reportedly told her therapist on January 19, 2012 that she did not want to return to work as scheduled the upcoming April.  Finally, there are no treatment records from 4/16/12 forward to review.  Since the attending provider did not return telephone calls, it was not possible to determine through telephone conversation with the provider whether the claimant had remained symptomatic from that time forward.

(Doc. 30-3, p. 3).  Dr. Barclay concluded that, from a psychiatric perspective, the available information was insufficient to support impairment or work restriction. (*Id.*).

Defendant issued a five-page letter on June 5, 2012, advising Plaintiff that it

had reconsidered her claim but still must deny her benefits as of April 16, 2012.

(Doc. 30-2, p. 46).  Defendant again quoted the relevant LTD Policy language,

including the definition of "any occupation" applicable to Class 3 employees, and

referred to its letter of April 4, 2012, as outlining the reasons for the denial of

benefits.  (Doc. 30-2, p. 46).  The letter summarized the various opinions of the

medical professionals who reviewed Plaintiff's file and, also, apprised her of her

right to file an appeal.  (Doc. 30-2, pp. 47-49).

C.     **Disputed Facts**

The parties differ on two key factual issues.  First, the parties do not agree

on the amount of Plaintiff's monthly LTD benefit or her pre-disability wage.

Plaintiff states that the long-term disability benefit listed in her claims file was

$5,245.70 per month, and that this figure indicates that her pre-disability earnings

were $8,742.83 per month, or $104,914.00 yearly.  (Doc. 26, ¶ 32).[5]  She cites an

overpayment calculation spreadsheet (offsetting her receipt of social security

benefits) (Doc. 26-14, p. 2), and an Explanation of Benefits Statement (Doc. 26-18,

pp. 2-3), both of which show her gross benefit at $5,245.70.  The Transferable

Skills Analysis Report produced by Cascade also lists Plaintiff's monthly benefit at

---

[5]  By way of explanation, Plaintiff states that her pre-disability yearly income is not listed in her file, but, based on her monthly disability benefit, which is calculated at 60% of her pre-disability wage, posits that she must have been earning $104,914.00 per year, or $8,742.83 per month.

this amount.  (Doc. 30-6, p. 27).  Defendant maintains that Plaintiff's monthly

benefit was $4,496.32, and that her pre-disability earnings were $7,493.96 per

month, or $89,927.55 yearly.  (Doc. 36, ¶ 32).  Defendant cites various portions of

the record indicating that Plaintiff had earned $7,493.86 per month prior to her

disability and that her monthly benefit was $4,496.  (*See* Doc. 30-2, p. 27 (Claim

Coversheet Report listing salary of $7,493.86); Doc. 30-2, p. 8 (claim note from

12/8/11 stating that "gross benefit incorrectly noted as $5,245.70 when it is

$4496"); Doc. 30-2, p. 11 (claim note from 5/26/11 listing annual salary at

$89,927.55, monthly salary at $7,493.96, and gross monthly benefit at $4,496.38);

Doc. 30-2, p. 15 (claim note from 3/17/11 stating that monthly salary is $7,493.95

and annual salary is $89,927.55); Doc. 30-7, p. 5 (Initial Payment Set up

Worksheet listing annual salary at $89,927.55 and monthly salary at $7,493.96).  In

particular, as to the Transferable Skills Analysis, Defendant cites a Claim Note

entered in Defendant's file on December 9, 2011, indicating that the report listed

Plaintiff's monthly benefit inaccurately.  (Doc. 30-2, p. 8 (stating "TSA [of]

12/1/11 has gross benefit incorrectly noted as $5245.70 when it is $4496")).

    In addition, the parties disagree on whether Plaintiff was a Class 3 or 4

employee, which classification dictates the applicable definition of "any

occupation" for purposes of determining long-term disability.  Plaintiff maintains

that she was a Class 3 employee (Doc. 1, ¶ 14), as indicated by Defendant in both denial letters.  (Docs. 30-2, p. 46; 30-4, p. 10 (quoting the definition of "any occupation" relevant to Class 3 employees)).  Defendant asserts that Plaintiff was Class 4 (Doc. 35, p. 15 n.3), and submits the declaration of Paula McGee, Litigation Manager, explaining that Defendant mistakenly quoted the Class 3 definition in the letters (Doc. 30, ¶ 5).

## II.    PROCEDURAL HISTORY

Plaintiff commenced the instant action by filing a Complaint on March 5, 2013 (Doc. 1), challenging the denial of her long-term disability benefits.[6] Centrally, she cited that none of the occupations identified by Defendant met the definition of "any occupation" applicable to Class 3 employees, since none had wages of more than 60% of her pre-disability earnings, thus compelling a finding that she was disabled.  (Doc. 1, ¶¶ 28-29).  Plaintiff seeks compensatory damages in the amount of $5,245.70 per month plus interest from April 15, 2012, to the present, a declaration that Defendant must continue to pay such benefits so long as Plaintiff remains disabled and otherwise eligible, and attorney's fees and costs. (Doc. 1, p. 5).

---

[6] Comcast Corporation and Liberty Mutual were also named as Defendants in the Complaint, but, pursuant to stipulation, were dismissed without prejudice on April 30, 2013. (Doc. 9).

Defendant filed an Answer with Affirmative Defenses on May 6, 2013 (Doc. 10). Some seven months later, on December 2, 2013, the parties filed cross-motions for summary judgment (Docs. 24, 27), along with supportive filings. The Court has the benefit of a full complement of submissions, and the case is thus ripe for review.

## III.   STANDARD OF REVIEW

"[A] denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where an administrator possesses such authority, its decision is subject to an arbitrary and capricious standard of review, such that it will be vacated only "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller v. Am. Airlines Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted)); *see also Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010) (noting that the phrases "arbitrary and capricious" and "abuse of discretion" are interchangeable in describing the deferential standard of review applicable to ERISA matters). In

addition, we apply the arbitrary and capricious standard in reviewing an

administrator's factual determinations, where it acted within its authority as fact-

finder. *See Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012)

(citations omitted). The Third Circuit has explained that the "broad grant of

discretionary authority to the Administrator to apply the plan must encompass the

resolution of factual disputes, because such fact-based determinations of eligibility

for LTD benefits are certainly one of the questions arising in the administration,

interpretation and application of the plan." *Id.* at 122 (citations and internal

quotation marks omitted).

Prior to the Supreme Court's decision in *Metropolitan Life Insurance*

*Company v. Glenn*, 554 U.S. 105 (2008), the Third Circuit employed a "sliding

scale" approach to adjust the arbitrary and capricious standard of review, whereby

"the level of deference . . . accorded to a plan administrator would change

depending on the conflict or conflicts of interest affecting the plan administration."

*Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).

However, following *Glenn*, the Third Circuit concluded that the "sliding scale"

review was no longer appropriate. *See id.* "Instead, courts reviewing the decisions

of ERISA plan administrators . . . in civil enforcement actions brought pursuant to

29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard

16

of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator . . . abused its discretion." *Id.* (citations omitted).  Factors for the court's consideration include structural concerns, like an administrator's conflict of interest in both funding the plan and evaluating claims, and procedural issues, like irregularities in the process preceding denial of benefits.  *See generally Miller*, 632 F.3d at 846-56.  For example, in terms of procedural issues, an administrator's actions may signal an abuse of discretion where it reverses a decision to award a claimant benefits without receiving any new medical documentation to support the change; imposes requirements extrinsic to the plan in evaluating eligibility; fails to comply with the notice requirements of ERISA; does not address all of the relevant medical diagnoses; or improperly considers a claimant's ability to perform the requirements of her own occupation or any occupation.  *See id.*

Reviewing an administrator's denial of benefits as described places a district court more in the position of appellate tribunal than trial court, *see*, *e.g.*, *Gibson v. Hartford Life & Acc. Ins. Co.*, No. 2:06-cv-3814, 2007 WL 1892486, at *5 (E.D. Pa. June 29, 2007), and, "[i]n an ERISA benefit denial case, trial is usually no option." *Leahy v. Raytheon, Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002).  In general, a district court must limit its review to the materials that were before the

administrator when it made the disputed ruling.  *See Howley v. Mellon Fin. Corp.*,

625 F.3d 788, 793 (3d Cir. 2010); *see also Kosiba v. Merck & Co.*, 384 F.3d 58, 67

n.5 (3d Cir. 2004) ("[I]n general, the record for arbitrary-and-capricious review of

ERISA benefits denial is the record made before the plan administrator, and cannot

be supplemented during litigation[.]" (citation omitted)).  "The scope of this review

is narrow, and 'the court is not free to substitute its own judgment for that of the

defendant[ ] in determining eligibility for plan benefits.'" *Doroshow v. Hartford*

*Life & Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (quoting *Abnathya*, 2 F.3d

at 45).

Also applicable here is the standard of review pertaining to summary

judgment motions.  This means that the Court must determine whether the moving

party has established "that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  FED. R. Civ. P. 56(a).  In

doing so, a court must view the facts in the light most favorable to the non-moving

party, drawing all reasonable inferences therefrom, and should not evaluate

credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution,*

*L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000)).[7]

## IV.   DISCUSSION

### A.    Plaintiff's Motion for Summary Judgment

Plaintiff argues that Defendant's  determination to terminate her long-term

disability benefits was arbitrary and capricious.  Specifically, she asserts that the

Court should apply a less deferential standard of review; Defendant wrongly

determined that Plaintiff could earn 60% of her pre-disability earnings; and

Defendant improperly declined to credit the medical opinion of her treating

psychiatrist, Dr. Wang.  Here, as well, we will address Plaintiff's contention that

Defendant did not comply with ERISA's notice requirements, although she raises

this claim in her opposition to Defendant's Motion for Summary Judgment.

#### 1.    Structural and Procedural Factors

##### a.    Heightened Standard of Review Based on Perceived Structural and Procedural Irregularities
In arguing that this Court should apply a more exacting standard of review,

---

[7] An "obvious discongruence" has been noted between the above standards.  *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002).  On the one hand, the arbitrary and capricious standard requires only that an administrative decision be supported by substantial evidence, while, on the other hand, the summary judgment standard inquires whether the entry of judgment is inevitable, even indulging all reasonable inferences in the nonmovant's favor.  However, as the First Circuit has observed, the degree of deference due to a plan administrator is an underlying legal matter, and, by contrast, summary judgment provides a procedural mechanism designed to dispose of cases with no triable issues.  *See id.* at 17-18.  Taking these paradigms together, "the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits."  *Id.* at 18.

Plaintiff alleges that Defendant had an inherent conflict of interest, because it both determined eligibility and paid benefits to participants, and based on perceived irregularities in the review of Plaintiff's claim.  To the extent Plaintiff seeks heightened review, her argument is squarely defeated by Third Circuit precedent, which, as discussed, mandates an across-the-board arbitrary and capricious standard of review.  *See*, *e.g.*, *Estate of Schwing*, 562 F.3d at 525.  However, the Court will consider Defendant's dual role as insurer and administrator of the plan, along with any procedural issues, in determining whether Defendant abused its discretion in denying Plaintiff benefits.  *See id.*

### b.    Disability Determination

Next, Plaintiff disputes Defendant's disability determination, specifically challenging Defendant's calculation of the wage required to meet the definition of "any occupation" under the Policy.  She maintains that she is a Class 3 employee, that she received a gross monthly benefits of $5,245.70, and that, pursuant to the Policy, this benefit amount was equal to 60% of her pre-disability income.  She argues, therefore, that under the applicable definition of "any occupation," she must earn more than 60% of her pre-disability income, *i.e.*, more than $5,245.70 per month, and states that none of the occupations identified by Defendant reached this income threshold.

Even if her monthly benefit totaled $4,496.32, she observes that the wages listed for Customer Service Representative and Dispatcher do not meet this threshold, and argues that, although the Sales Representative (Own Occupation) position does present wages exceeding $4,496.32, Defendant has already accepted the opinion of Dr. Cimino that she is unable to perform this job (*i.e.*, her own occupation). She further argues that Defendant never indicated whether it was relying on the metropolitan, state, or regional wage calculations and highlights that the Census Pacific/West Region wages do not meet the threshold, noting that she now lives in Oregon. Further, Plaintiff points out that there is an additional Occupational Analysis/Vocational Review in Plaintiff's file, dated May 11, 2011 (Doc. 26-12, pp. 2-6), which utilizes a different, "non-metropolitan statistical area," the Mother Lode Region, CA, presenting lower wages.

Lastly, Plaintiff notes that she employed a vocational consultant, Terry P. Leslie, subsequent to the denial of benefits. Mr. Leslie reviewed Plaintiff's claims file and the medical records and interviewed Plaintiff, and, in a letter dated October 9, 2012, opined that "[n]one of the wages provided by [Defendant's] own representative would allow [Plaintiff] to generate" earnings of $5,245.70 per month. (Doc. 26-9, p. 4).

In opposition, Defendant first charges that Plaintiff has waived any argument

protesting the earnings associated with the identified occupations because she

failed to raise such assertion during the administrative review process.  *See Peruzzi*

*v. Summa Medical Plan*, 137 F.3d 431, 435 (6th Cir. 1998) (where the plaintiff

asserted a new theory in court, stating that "[w]e are doubtful that [the plaintiff]

may properly raise this argument now because it is unclear that he presented it to

the plan administrator"); *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380

(10th Cir. 1992) ("In determining whether the plan administrator's decision was

arbitrary and capricious, the district court generally may consider only the

arguments and evidence before the administrator at the time it made that decision."

(citations omitted)).  Reaching the merits, Defendant maintains that Plaintiff is a

Class 4 employee, subject to the Class 4 definition of "any occupation," but asserts

that the distinction between Class 3 and Class 4 employees is immaterial in this

instance.  By way of explanation, Defendant notes that the Class 4 provision

defines "gainful occupation" as, *inter alia*, an occupation in which earnings are

"equal to or greater than the gross benefit."  Thus, maintaining that Plaintiff's gross

benefit was $4,496.31, Defendant argues that Plaintiff can perform "any

occupation" under both the Class 3 and Class 4 definitions so long as she could

earn more than $4,496.31, asserting that this sum constitutes both 60% of

Plaintiff's pre-disability earnings (Class 3) and the amount of her gross benefit

(Class 4).  Defendant points to the wage table contained in the  Transferable Skills Analysis to demonstrate that Plaintiff could earn more than $4,496.31 monthly.

As to Plaintiff's argument that she is unable to perform the duties of Sales Representative, Defendant argues that the Transferable Skills Report considered the physical restrictions imposed by Dr. Cimino and concluded that she could perform such occupation as that occupation is performed in the national economy (*i.e.*, at both the sedentary and light physical demand levels).

While it is arguable that Plaintiff waived her claim regarding wage calculation by failing to raise it during the administrative proceeding, *see*, *e.g.*, *Sandoval*, 967 F.2d at 380, we nonetheless examine the merits of Plaintiff's contention.  In considering the parties' respective positions, we underscore that we are prohibited from weighing evidence and must instead accord deference to the administrative decision, considering whether Defendant's ultimate ruling was supported by "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion."  *Fleisher*, 679 F.3d at 126 (citation and internal quotation marks omitted).  Here, Defendant has pointed to substantial record evidence indicating that Plaintiff's pre-disability wage was $7,493.86 per month, and that her gross monthly benefit was 60% of her prior wage, or $4,496.31.  *See* discussion *supra* Part I.C.  Furthermore, we agree with Defendant

that, regardless of whether the Class 3 or Class 4 definition of "any occupation" is applied, Defendant's vocational analyses indicate that Plaintiff is able to perform an occupation earning above the wage threshold for a finding of disability; Defendants proffer sufficient evidence of Plaintiff's potential earnings by way of the wage table prepared for the Transferable Skills Analysis and reproduced herein. *See* chart *supra* Part I.B. In view of Defendant's discretionary authority to apply the plan, encompassing fact-based eligibility determinations, *see Fleisher*, 679 F.3d at 122, we cannot say that Defendant acted arbitrarily and capriciously in concluding that Plaintiff could perform "any occupation" and, thus, was not disabled.

As to Plaintiff's contention that Defendant erred by not calculating potential wages relative to her new residence in Oregon, we note that Plaintiff relocated there in February 2012, more than a year after she became disabled and just two months before the expiration of her "own occupation" benefits. Plaintiff points to no Policy provision requiring Defendant to revise the applicable labor market report based on a claimant's recent relocation, and we find no authority in the Policy or otherwise to compel such.

Lastly, we do not consider the report of vocational consultant Leslie as we see no reason to depart from the general rule limiting our review to the record

before the administrator.  *See Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir.

2004).

### c.      Treatment of Medical Evidence

Next, Plaintiff contends that Defendant acted improperly by not crediting the

opinion of Dr. Wang that Plaintiff was permanently disabled due to mental health

issues.  She disputes Defendant's reliance on the assessment of Dr. Barclay, chiefly

noting that he was not a treating physician.  Plaintiff cites *Ott v. Litton Industries,*

*Inc.*, No. 4:04-cv-763, 2005 WL 1215958 (M.D. Pa. May 20, 2005), in support, in

which we held that an administrator abused its discretion by relying on the

opinions of two non-examining physicians in rejecting that plaintiff had

fibromyalgia, where the diagnosis was supported by the plaintiff's treating

physician of several years and three specialists.  In addition, Plaintiff advances that

Defendant improperly ignored the opinion of the SSA that Plaintiff was disabled.

In response, Defendant asserts that plan administrators need not weight the

opinions of treating physicians more heavily and that courts have routinely upheld

administrative rulings which credit the opinion of a reviewing physician over that

of a treating physician.  *See*, *e.g.*, *Eppley v. Provident Life & Acc. Ins. Co.*, 789

F.Supp.2d 546, 570-71 (E.D. Pa. 2011).  As to consideration of the determination

of the SSA, Defendant asserts that it is not bound by such determination and

highlights that a claims administrator and the SSA apply different eligibility standards. *See*, *e.g.*, *Hoch v. Hartford Life & Acc. Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *16 (E.D. Pa. April 29, 2009).  Defendant also notes that the SSA's summary award letter contains no evidence of the reason for awarding benefits and that the award was issued in April 2011 and, therefore, does not appertain to Plaintiff's psychiatric condition, as she did not begin mental health treatment until January 2012.

As Defendant avers, plan administrators are not required to accord special weight to the opinion of treating physicians or explain why they credited reliable evidence that conflicts with such opinions. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  In weighing the opinions, relevant considerations include the length of the relationship between the claimant and the treating physician and whether any of the physicians in question are specialists. *See Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.Supp.2d 261, 289 (W.D. Pa. 2008) (citing *Black & Decker*, 538 U.S. at 832).  As to the relevance of an SSA determination, a plan administrator is not bound by such ruling, particularly in light of the different eligibility standards imposed for a finding of ERISA disability versus SSA disability. *See*, *e.g.*, *Hoch v. Hartford Life & Acc. Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *16 (E.D. Pa. April 29, 2009).  However, an SSA

award may be considered as a factor in evaluating whether a plan administrator abused its discretion. *See Dorsey v. Provident Life & Acc. Ins. Co.*, 167 F.Supp.2d 846, 856 n.11 (E.D. Pa. 2001).

In the instant case, Defendant undertook a multi-tiered review of Plaintiff's mental health records and ultimately credited the opinion of Dr. Barclay over the opinion of Dr. Wang. The record shows that Dr. Wang began treating Plaintiff in January 2012, that records from that treatment spanned approximately three months, and that Plaintiff did not produce any other records of previous mental health treatment. A review of the evidence shows that the medical records rely heavily on Plaintiff's self-reporting, and, as Dr. Barclay highlights, there is no measure to determine the medical accuracy of Plaintiff's representations. Furthermore, from a procedural standpoint, we note that Defendant sought the opinions of three medical professionals, including a specialist, in reviewing Plaintiff's benefits determination.

In terms of the import of the SSA award, Defendant rightly observes that the determination is irrelevant to Plaintiff's instant mental health claims, as the determination was rendered prior to Plaintiff's psychiatric treatment.

### d.    Compliance with ERISA's procedural requirements

In an argument pitted against Defendant's Motion for Summary Judgment,

Plaintiff additionally asserts that Defendant failed to meet the procedural requirements of ERISA because the denial letters indicated the wrong threshold for a denial of benefits.  Plaintiff maintains that the Class 4 definition of "any occupation" was not listed in the letter and cannot now be relied upon in support of termination.  She additionally argues that the termination letters were inadequate because they did not sufficiently explain the rationale for denial of benefits.

Defendant responds that the mistaken reference to Class 3 employee definition was harmless.

Section 503 of ERISA, in relevant part, requires that every employee benefit plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan was been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant[.]"  29 U.S.C. § 1133(1).  The relevant regulations elaborate that the notification must include, *inter alia*, reference to the specific plan provisions on which the determination was based.  *See* 29 C.F.R. § 2560.503-1(g)(1)(ii).

Here, as previously stated, Plaintiff's initial denial letter provided the correct definitions of "disability" and "material and substantial duties" but provided an inapplicable definition of "any occupation."  (Doc. 30-4, p. 10).  It listed the medical evidence considered by Defendant, and noted that, although

correspondence from Dr. Wang indicated that Plaintiff could not resume employment, a documents request revealed no record of treatment.  (Doc. 30-4, p. 11).  The letter then stated that a vocational analysis was conducted based only on Plaintiff's physical restrictions as reflected in the opinion of Dr. Cimino.  (Doc. 30-4, p. 11).  The notice provided the results of the vocational analysis, including Plaintiff's transferable skills and the occupations identified by the vocational specialists as within Plaintiff's capability, along with the wage table for those occupations *supra*.  (Doc. 30-4, p. 11).  In addition, the letter apprised Plaintiff of her right to request a review of the determination and the procedure for doing so. (Doc. 30-4, p. 12).

By Defendant's own admission, it was error to provide the definition of "any occupation" applicable to Class 3 employees.  Yet, as previously enumerated, we agree with Defendant that such error was harmless.  *See* discussion *supra* Part IV.1.b.  In terms of the letter's recitation of the reasons for the benefits denial, we find the proffer to be sufficiently compliant with Section 503.  Although the denial notice did not "connect the dots" by performing a wage calculation, it did set forth the policy provisions, medical evidence, and results of the vocational examination critical in rendering a determination.  *Contra Berkoben v. Aetna Life Ins. Co.*, ___ F. Supp. 2d ___, No. 2:12-cv-1677, 2014 WL 1235915, at *20 (W.D. Pa. March

25, 2014) (ruling that the administrator did not comply with the notice requirements of ERISA where it failed to inform the claimant of one of the reasons for termination and certain evidence it relied upon, and did not permit the claimant an opportunity to examine the evidence or provide rebuttal evidence).

Turning to the letter reporting the results of reconsideration, we note initially that it also contained the incorrect definition of "any occupation." In all other respects, however, we find that this letter provided adequate notice to Plaintiff within the meaning of Section 503. It quoted extensively from the opinions of Nurse Scarponi and Dr. Barclay, concluding that the totality of information in the file was insufficient to support restrictions from a psychiatric perspective, and also provided notice of the right to appeal.

## 2.  Weighing the Factors

To decide whether Defendant's determination was arbitrary and capricious, we take an accounting of all of the case-specific factors and reach a result by weighing all together. *See Miller*, 632 F.3d at 855 (citing *Glenn*, 554 U.S. at 117). We give slight weight in Plaintiff's favor to the fact that Defendant operated under a conflict of interest, in view of Defendant's incentive to deny a benefits claim. We likewise give some weight to the fact that the denial notices provided the incorrect definition of "any occupation." However, we observe that such error

appears clerical in nature, and, moreover, does not affect the calculation of post-disability earnings, as previously discussed.  As to the dispute concerning wage calculation, as we find Defendant's position supported by substantial evidence, we do not give this contention much weight.  We attribute little to no weight to the assertion that Defendant improperly considered the medical opinion of Dr. Wang. Considering the factors together, we find that the structural conflict and procedural irregularities were relatively minor and do not indicate that Defendant acted arbitrarily and capriciously in denying Plaintiff's claim.

In sum, viewing the aggregate evidence in the light most favorable to Defendant, we hold that the record does not support a determination that Defendant abused its discretion in denying the claim for benefits.

### B.    Defendant's Motion for Summary Judgment

In support of its Motion, Defendant reiterates that an arbitrary and capricious standard of review is applicable and argues that substantial evidence supports its determination that Plaintiff was not eligible for long-term disability benefits. Defendant highlights that record evidence supports that Plaintiff was physically able to perform a sedentary occupation and that she did not suffer from a psychiatric condition preventing her from undertaking such employment.  Plaintiff lodges protestations similar to those previously addressed.

Based on the foregoing discussion, and viewing the record in the light most favorable to Plaintiff, we hold that the evidence supports that Defendant did not abuse its discretion in denying Plaintiff's benefits claim.

## V.   CONCLUSION

To conclude, we have considered whether Defendant, substantively or procedurally, abused its discretion, specifically taking into account that Defendant was both the insurer and administrator of the plan and noting that the record contains conflicting evidence concerning Plaintiff's wage and benefits amount and her employment classification, as well as the other procedural irregularities.  Our task is not to weigh the evidence, but rather to consider whether substantial evidence supported Defendant's eligibility determination and ultimate denial of benefits.  To be sure, the administrative record contains some discrepancies suggestive of carelessness, and we admonish Defendant for any such inadvertence. But, at the same time, we are not persuaded by Plaintiff's efforts to selectively extrapolate from the record in fashioning her claim.  Ultimately, we find the existence of substantial record evidence supporting Defendant's denial of benefits, and, therefore, we hold that Defendant did not act arbitrarily and capriciously. Accordingly, we shall deny Plaintiff's Motion for Summary Judgment, and we shall grant Defendant's Motion for Summary Judgment.

An appropriate order shall issue.